## ALLEN WILLIAMS v. STATE.

### No. A-2305.   Opinion Filed October 2, 1915.

#### (151 Pac. 900.)

1. **INSTRUCTIONS ON MANSLAUGHTER—Evidence.** In a prosecution for murder, where the evidence for the state tends to support the judgment and there is no evidence tending to support the lower degrees of the crime, but the evidence of the defendant tends to prove excusable homicide on the ground of accident without negligence or fault on his part, it is not necessary for the court to instruct the jury upon the law of manslaughter in either degree.

2. **INSTRUCTIONS—Request.** If upon the trial of a criminal case special instructions are desired by the defendant, he is required by the provisions of our code of criminal procedure to present in writing to the court the instructions desired, and it is not error for the trial court to omit to instruct upon every possible question under the defendant's theory of the case, when he has not requested such instructions.

3. **APPEAL—Verdict—Evidence.** Where, after an examination of the entire record it appears that the defendant has had a fair and impartial trial, and that no material error has been committed by the trial court, and the verdict seems to be amply sustained by the evidence, this court will not disturb the verdict or judgment of the trial court.

(Syllabus by the Court.)

*Appeal from District Court, Creek County;*
*Chas. B. Wilson, Jr., Judge.*

Allen Williams, was convicted of murder and appeals. Affirmed.

*J. F. Lawrence* and *J. V. Frasier,* for plaintiff in error.

*R. McMillan,* Asst. Atty. Gen., for the State.

DOYLE, P. J.   The plaintiff in error was convicted of the crime of murder committed upon his wife by shooting her with a shot gun, and the jury assessed the punishment at imprisonment for life.   He has appealed from the judgment entered upon such conviction.   It appears from the record that no exceptions were

taken on the trial to rulings of the court and no exceptions were taken to the instructions given by the court to the jury and no instructions were requested to be given by counsel for the defendant, but upon the argument of this appeal it was contended that the judgment should be reversed.

First, Because the court erred in failing to instruct as to manslaughter.

Second, Because the evidence was insufficient to sustain the verdict of the jury.

The defendant, Williams, and his wife, Georgia Williams, resided on a farm about twelve miles south of Depew, Creek county. On the 25th day of July, 1913, he shot his wife. His defense was that it was an accidental killing without culpable negligence or fault on his part.

Briefly stated the substance of the evidence is this: Frank Whitfield testified that he lived about a half mile from the defendant; that on the 25th day of July, between nine and ten o'clock in the forenoon, the defendant called at his place and said that he had shot his wife but did not think she was seriously hurt, and wanted my wife and I to go and see her; that he called his wife and they went to the defendant's place and saw the body of a woman on a cot in the passage way between a double log house. Some chickens were on the body and picking at the face. That he left his wife there and went to notify the neighbors; that the defendant had lived on his place the preceding months of January, February and March and during that time on several occasions he heard the defendant make threats against his wife, saying, "That he was going to kill her in case she would mistreat him as she had done."

Elizabeth, wife of Frank Whitfield testified that the defendant came to their house and said he had shot his wife and they went to his place and found her dead body lying on a cot; that in February while the defendant was living on their place she heard the defendant say, "that his wife had gone off with another man and if she ever owned it he was going to kill her," that about the first of April in her house, when Kelly Humphreys was present

the defendant said, "A man had taken his wife and if she ever owned it he was going to kill her," that while she was there with the dead body that morning the defendant picked up a shot gun and she said to him, "not to bother anything until they hold the inquest," and that she noticed that the defendant had a revolver in the belt of his pants; that he left her and went out in the field and was gone ten or fifteen minutes and when he came back he said, "His wife owned it that she went off with that man, that she owned going off this morning with that man."

James Batts testified that he lived about a mile and a half from the defendant and made an examination of the body of the deceased that morning and noticed a wound in the small of the back, that "you might put a small size egg in it." That he had heard the defendant make threats against the life of his wife, that he said, "He had stood a whole lot and before he would stand it again he would kill her. That she went to Kansas City with Tom Berry and then sent to him for a ticket to return and he sent her a ticket but if he had any more trouble like that again he would kill her." That in the last days of June witness was going to Depew with Mr. Hollis and the defendant asked for a ride to Depew and he talked about his family trouble and remarked that "before he would stand what he had stood from her he would kill her."

Henry Ransom testified that he lived about half a mile from the defendant and about the first of May defendant told him that his wife ran off once with a fellow and if she ever undertook to do it again he was going to kill her. That later he heard the defendant say that his wife was mistreating him and he could not stand it much longer; that if she kept on mistreating him he would kill her.

A. R. Nauman testified that he was at the defendant's place that morning and the defendant stated that it was between eight and nine o'clock when his wife was shot.

For the defendant Mrs. Mary Worley testified that she was out hunting grapes that morning and went to the defendant's place to ask him where she could find a grape patch; that she

found his wife lying on a cot and he was sitting by her on a box brushing the flies from her face; that the woman asked her to come in and the defendant told her that he accidentally shot his wife and his wife said that she was going to die and asked witness and the defendant to kill her and witness told her she was going for some grapes. That it was then about ten or eleven o'clock.

Carl Williams testified that he was a son of the defendant and the deceased was his step-mother. The occurrences attending the homicide were narrated by him as follows:

"I got up and made the fire and my step-mother came in and got breakfast and papa cleaned up the room after breakfast, and he said I am going over to Mr. Yancey's, and my step-mother said I was not intending to go until tomorrow, but if you are going I will go too. So papa said all right and they started out in a little while and I was coming back from the hog pen and I seen my step-mother going towards the well, and I seen her fall. That's all. I came on to the house and helped take her in the house and I went and put on my shoes and went after the doctor. My step-mother said to go for the doctor. Dr. Woods didn't come, he said he didn't have anything to dress the wound with. My step-mother wanted papa to take his gun along to kill squirrels. She said she was tired of fish and wanted squirrels. I did not see the shot fired. I was not paying any attention to it."

John Yancey, and his wife Eliza, both testified that they lived about two miles from the defendant and the day before the killing the deceased was at their place sewing, and Yancey and the defendant went fishing; that they went home that evening and they gave them some molasses in a gallon bucket, and the deceased left the dress she was making at their place.

Testifying in his own behalf the defendant narrated the occurrences attending the homicide as follows:

"The first thing I called my boy to make the fire, and my wife asked me to clean up the house while she got breakfast, and she said where are you going today and I said I promised to bring Mrs. Yancey's bucket back today, and she said I wasn't intending to go over but being as you are going, I will go back and finish my dress, and you will help me do the washing tomorrow, and I said certainly, and so she combed her hair and said she would be ready in a little while, and I got my gun out

and I said to her 'how long will you be?,' and she said as soon as she combed her hair and dressed, and I was standing on the ground about a step and a half from the porch, and my wife said as soon as I see that the trough is full of water for the ducks I will be ready. She passed by me going to the well. I was standing there and waiting on her, as she passed by me I happened to look at this gun and I seen it was off of safety and I reached down in this shape (indicating) and it went off just that way (indicating). I did not know that I shot my wife until she hollered and said: 'You have shot me' and I threw down the gun. I called my son to help me and we took her and carried her to the porch and laid her on a cot and I said go and call some one right quick and she said, get the doctor quick I am suffering terribly, and I said hurry and get Dr. Woods, and I was sitting by her side brushing the flies from her face when Mrs. Worley came by and said, 'Do you know where I could get some grapes?,' and I said, 'No, unless you can get them up in the pasture there,' and she said, 'Is someone sick,' and I said, 'No, my wife was accidentally shot,' and she said, 'How did it happen,' and I went on to relate to her how it happened. Mrs. Worley said, 'Have you sent for a doctor or for any one,' and I said, 'I have sent my boy for the doctor.' I said 'There is Simon Thomas, if you could get word to him I am satisfied he would come,' so she left."

He further stated that his wife died about an hour and a half after she was shot and he then went down to Whitfields. That he did not own a six shooter and did not have one that morning. He denied having ever made any threats against his wife. On cross-examination he stated that he knew his wife went to Oklahoma City and from there to Kansas City, but did not know that she went away with Tom Berry. That they had been married about five years and never had a fight.

Plaintiff in error's brief is prefaced as follows:

"Was the failure of plaintiff in error to request instructions for manslaughter a waiver, especially to estop him from now presenting this objection to this court?"

Upon the record before us counsel for plaintiff in error have not properly raised the question. Only prejudicial errors raised by exceptions reserved, require a new trial, and it is only when we are satisfied that the verdict was contrary to law, or to the evidence, or that injustice has been done, that we are permitted

to reverse a conviction, whether or not an exception has been taken in the trial court. The instructions of the court submitted the issue of murder and justification on the theory of the defense that it was a case of accidental shooting, for which the defendant was not criminally responsible. The instructions given were unexceptional, and as before stated the defendant did not request the court to give instructions covering the law of manslaughter in any degree. If the defendant's counsel had requested further instructions and they had been refused and exception taken, the question would have been properly raised. In a prosecution for murder it is the duty of the trial court to determine, whether there is or is not any evidence which tends to prove different degrees, and when the court has determined that there is some evidence tending to prove different degrees, then the law of each degree which the evidence tends to prove should be submitted to the jury.

Bishop says:

"The charge should state the law in its application to the facts, as already explained, correctly and fully. If, for example there are different degrees of an offense, the law of each degree, which the evidence tends to prove, should be given, but not of any degree which it does not tend to prove." Bishop's Crim. Proc. Par. 980.

Our penal code defines manslaughter in the second degree as:

"Any killing of one human being by the act, procurement or culpable negligence of another, which under the provisions of this chapter, is not murder, nor manslaughter in the first degree, nor excusable nor justifiable homicide, is manslaughter in the second degree." (Section 2325 Rev. Laws.)

This is the provision which counsel for plaintiff in error claims applies in this case, and which the charge of the court failed to cover. The offense of manslaughter in the second degree can only be sustained by proof that death ensued as a direct result of the defendant's negligence. The defendant was the only eye witness and upon his testimony alone can there be any claim of manslaughter in the second degree. According to his testimony it was clearly a case of accidental shooting without negligence on his part and he was not guilty of any offense.

In the case of *New* v. *Territory,* 12 Okla. 172, 70 Pac. 198, the defendant was convicted of murder. He admitted firing the fatal shot, and sought to justify on the ground of necessary self-defense. The court instructed the jury as to the law of murder and of self-defense, but did not instruct the jury as to the law of manslaughter. In the opinion it is said:

"In the case at bar there was no instruction upon this point. The instructions of the court simply covered the law of murder. Nor did the defendant ask for any instructions covering the law of manslaughter in any degree. We think the plaintiff in error has not properly raised this question. If the defendant was entitled to instructions upon this point, he should have asked the court below to instruct the jury upon the law of manslaughter, and in the absence of such a request it was not error for the court to omit to give such instructions. It is true that the court should instruct the jury upon all questions involved in the case, but when the court has covered the case with general instructions, it is not error to omit to instruct upon some particular branch of the case deemed advisable by the defendant under his theory of the case, when the defendant has not asked for such instructions." (*Lovett* v. *State,* 30 Fla. 142; *Kelley* v. *People,* (Col.) 29 Pac. 805; *State* v. *Estepp,* (Kans.) *supra; State* v. *Hendricks,* 4 Pac. 1050.)

After a careful examination of the record in this case we are of opinion that the defendant has been fairly and impartially tried and convicted of the crime charged in the information. The evidence shows that for several months previous to the homicide the defendant had made numerous threats in conversations with several of his neighbors indicating an intention to kill his wife, and this evidence is only controverted by the naked denial of the defendant. The parties concerned were negroes, and that the defendant was a vicious tempered man, the evidence would seem fully to prove. As to the defense of accident, at best it presented a question of fact for the jury, and it having been determined as we think, according to the evidence, the duty of this court is performed by an affirmance of the judgment. The judgment of conviction will therefore be affirmed.

FURMAN and ARMSTRONG, JJ., concur.