## A. L. WALKER v. STATE.

No. A-7411. Opinion Filed March 21, 1931.
Rehearing Denied April 11, 1931.
(297 Pac. 331.)

Wm. H. Lewis and C. R. Reeves, for plaintiff in error.

J. Berry King, Atty. Gen., and J. H. Lawson, Asst. Atty. Gen., for the State.

DAVENPORT, P. J.   The plaintiff in error, hereinafter called the defendant, was convicted of the crime of murder, and his punishment fixed at imprisonment in the state penitentiary for life at hard labor.  Motion for new trial was filed, considered, overruled, and exceptions saved, and defendant appeals.

The testimony in this case tends to show that the wife of the defendant, who it is alleged the defendant murdered, prior to her marriage to the defendant, had been married to a man by the name of Haydon; after Haydon died, she married the defendant on December 13, 1927, about six months prior to her death.

The testimony further tends to show that about two months before the death of the deceased the defendant had paid a premium on a health and accident insurance policy of $1,000 on the deceased.   The afternoon of the alleged murder, the defendant went down to the old well to make some repairs and went to Roan's home to ask for a hammer; Roan went with the defendant back to the well, where a little mortar was made.   It was further shown that the defendant had cautioned the wife of Roan not to let the children come to the well, and gave as a reason they might fall in the well.   From the testimony it was disclosed that the well was shallow, and about six feet from the top to the water, and about some eight feet from the water to the bottom of the well; the well was about three feet in diameter.   Shortly after Roan left, the wife of Roan heard a woman scream, and about a half hour later the defendant came to her home and said his wife had fallen into the well and he was unable to get her out.   Neighbors gathered at the well, and removed the body of the deceased

from the well. Physicians were called in and made an autopsy to discover, if possible, the cause of death.

The testimony further shows that, shortly after the body was removed from the well, one of the neighbors pressed upon her stomach and a very small amount of water and some food came out of the mouth.

Dr. Cochran, physician and surgeon, testified as follows:

"I made an examination of the deceased, both internal and external.

"Q. What did your examination disclose? A. Well, it showed many external contusions on the body, on the face and head and back of the patient.

"Q. From your external examinations there could you tell whether or not there had been any bones broken in the body of the deceased? A. Well, in the back there were some bones broken; some of the ribs were broken loose.

"Q. Do you recall where the wounds were you observed on the head and face of the deceased? A. Well, I may not be able to place them exactly. I remember quite a contusion right across the right side of the head here, and on the left side this eye was badly swollen and this side of the face was edematous or swollen and it was all contused and one place right on the head where there was a cut clear through, and on the other side of the face there was a bruise or two—on the right side of the face also.

"Q. Now what did you do with reference to the examination of this body other than the external examination that you made? A. I removed the cranium, the fleshy part of the scalp and examined the bone first.

"Q. What was the condition of the scalp and the bone you observed there? A. There was multiple or

many blood clots between the scalp and the bony covering of the brain.

"Q. Describe those fully to the jury? A. Well, they ranged all the way in size from as large as that down to just small clots, formed in the soft tissues between the scalp and the bony covering of the brain and extended all over the side of the face and up over the top and on the back of the scalp; they were all over the side and back of the head.

"Q. Could you tell whether those contusions you observed were inflicted before or after death? A. They were inflicted before death.

"Q. Explain to the jury your reason for saying that? A. They would have to be. When a person dies their heart stops beating and the blood gathers in the large blood vessels and these bruises had been made while there was enough pressure in there to force the blood out of the tissues and into these places and there was blood clots surrounding each contusion on the head.

"Q. How many of the contusions were there approximately? A. Quite a bunch.

"Q. Whereabouts on the head were they? A. All over the side of the head. There must have been 15 or 20 of them and maybe more; there was a great bunch of them.

"Q. Do you recall whereabouts on the head they were? A. On the side of the head from the malar bone clear across to the other side. The deepest one was in the mid-line about opposite the ears and scattered on both sides and on the back of the head.

"Q. What else did you do with reference to the examination? A. I then removed the bony covering of the brain.

"Q. That is the skull? A. Yes, sir.

"Q. What observation or examination did you make after you removed that? A. As soon as they got through

removing that I found there was clots of blood in the middle sinus, going out through the dura, or outer covering of the brain, and that was inflicted before she died, and there was a clot there.

"Q. There was a blood clot on the dura, which is the outer covering of the brain? A. Yes, sir.

"Q. How many places had the brain been penetrated? A. That was the only place; it had been completely penetrated.

"Q. From the wounds you observed on the body of the deceased, can you tell the jury, in your opinion, which of these wounds was likely to produce death? A. Well, several of them might have done it, but that one in the top of the head could have produced death easily and likely did produce death.

"Q. Now, Doctor, from the examination made, could you be able to tell the jury what caused the death of Frances Walker? A. Well, I would say it was probably violence of some kind."

He was asked in his opinion as to the cause of her death, and answered:

"Well, in my opinion, the woman met her death by violence. She was not drowned. I couldn't tell whether she was beaten to death with a claw hammer, but in general I would say she was not drowned; it was by violent means."

Dr. Cochran further stated the wound upon the head could not have been inflicted after drowning in the drawing of the body out of the well. Several other doctors in substance testified to the same facts.

The evidence further shows that near the well in the cornfield a place was found indicating where parties had been wallowing on the ground, and from this place the tracks of a woman wearing a small shoe and that of a man wearing a No. 8 shoe; the tracks indicated they had

been running. Further on they found where there had been some one scuffling, where some one had fallen, and from this place the woman's tracks were not to be found; and the testimony tends to show that the man's tracks led from this place to the well where the body of the deceased was found.

The defendant testified in his own behalf, and claimed that the deceased had accidentally fallen into the well and drowned; he was younger than the deceased; he was kind to the deceased and assisted her in her work; had never had any trouble. The defendant states that on the date deceased lost her life he was down southwest of the well untangling some wire; during the morning prior to the death of the deceased he went to town and came back about 2 o'clock; after that he began making preparations between 4 and 5 o'clock to fix the well—

"My wife knew that I was going to fix the well; I picked up the sand and Mr. Roan and I tried a little of the lime and sand together to see how it would mix; my wife came to the well between 5 and 6 o'clock; I was standing over there at the fence undoing some wire when I first heard the scream; when I got there a pup was running around the well and I looked into the well; the water was dashing against the sides of the wall; I saw a hat in the well, and some rope was on the water, and I thought I would get into the well and if she came up I would catch her; I went down into the well and into the water up to my waist; I struck something with my foot and run this hand down, but could not feel anything; I looked over my head and it was a dangerous looking wall and I came out and went to the house and told Mrs. Roan about it; Mrs. Roan said she heard the scream; Mrs. Roan then went with me to the well and I told her I could not do anything by myself and was going for help."

The testimony further shows that the neighbors gathered and the deceased was taken from the well and examined by Dr. Cochran and several other doctors. Considerable testimony was taken with reference to the facts and circumstances from the time it is alleged the body of the deceased was discovered in the well up to and including the burial, which it is not deemed necessary to set out in this opinion. Some of the witnesses testify that when they saw the defendant shortly after they discovered the body of the deceased in the well, the defendant was wet to his waist and one arm was wet, but they could not remember which one.

The first assignment of error is the court erred in overruling motion for a new trial. The other assignments are embraced within this assignment, and the questions presented by the defendant will be considered together. The record shows that an insurance policy had been taken out on the life of the deceased, the defendant being the beneficiary in the policy named; and that the defendant during the day, for some unexplained reason, went to the tenant house on the place occupied by a man by the name of Roan for the purpose of getting a hammer; that he was going to repair the well box on the well; that he and Mr. Roan mixed some lime and sand together to see how it worked; that was some time in the afternoon of the day the deceased lost her life.

The record further shows that the defendant requested the Roan family, if they wanted water, to get it, as he was going to fix the well box, but he did not proceed to fix the well box, but was off some distance away from the well untangling some wire when he heard some woman scream. There was other testimony which tends to show that in the cornfield near the well were the tracks of a woman and man that indicated the parties had been run-

ning; a short distance away there were indications on the ground that a struggle had taken place, and the woman's tracks seem to have stopped and the man's tracks from there to the well were seen.

It is urged by the defendant that, in a case where the prosecution relies upon circumstantial evidence, it is incumbent on the state to establish the guilt of the defendant beyond a reasonable doubt; that all the facts and circumstances proven should not only be consistent with the guilt of the accused, but consistent with each other, and inconsistent with any other reasonable hypothesis or conclusions than that of his guilt. The defendant urges the court erred in giving instruction No. 8. Instruction 8 is as follows:

"Gentlemen of the jury, the state relies for a conviction in this case, upon what is known as 'circumstantial evidence;' and, in this connection you are instructed that to warrant a conviction upon circumstantial evidence each fact necessary to the conclusion sought to be established, that is, the guilt of the defendant must be proved by legal and competent evidence beyond a reasonable doubt; and all the facts and circumstances proved should not only be consistent with the guilt of the accused but consistent with each other and inconsistent with any other reasonable hypothesis or conclusion than that of his guilt and sufficient to produce in your minds a reasonable moral certainty that the accused committed the offense charged against him. You are instructed that when the circumstances are sufficient, under the rule herein given you, they are competent and are to be regarded by the jury as competent evidence for your guidance as direct evidence."

While none of the instructions given by the court were excepted to by the defendant, this court will examine the same for the purpose of determining whether any fundamental errors appear in the instructions. Instruction No. 8 is a verbatim copy of the instruction given in Carter v.

State, 6 Okla. Cr. 232, 118 Pac. 264, which instruction was approved by this court, and is a correct instruction upon the law of circumstantial evidence, and was reaffirmed by this court in Jackson v. State, 22 Okla. Cr. 354, 211 Pac. 1066.

The defendant argues at length upon the court's instruction No. 10, upon the question that he had instructed the jury to return a verdict of guilty under certain conditions.

Upon motion to correct the record, the original instruction was presented to this court showing that in instruction No. 10, as copied in the case-made, the word "not" had been omitted from between the words "defendant (and) guilty." This court ordered the case-made corrected so as to speak the truth. With this correction, instruction No. 10 stated the correct proposition of law to the jury.

In Ex parte Jefferies, 7 Okla. Cr. 544, 124 Pac. 924, 41 L. R. A. (N. S.) 749, in the second paragraph of the syllabus, this court said:

"In cases depending upon circumstantial evidence, where the circumstances proven are not only consistent with the guilt of a defendant, but are also inconsistent with his innocence, such evidence in weight and probative force may surpass direct evidence in its effect upon the court or jury."

The question of the sufficiency of the evidence is for the jury. In this case the jury had an opportunity to consider the weight of the evidence and credibility of the witnesses, their interest or lack of interest about which they testified, their means of knowledge, their demeanor on the witness stand; and, after considering all those facts, they found the defendant guilty of murder and as-

sessed his punishment at life imprisonment. This court has repeatedly held that, where there is any competent evidence to go to the jury, though conflicting, it would not disturb the verdict. Browning v. State, 31 Okla. Cr. 373, 239 Pac. 272; Wilson v. State, 32 Okla. Cr. 139, 240 Pac. 155; Shields v. State, 32 Okla. Cr. 344, 240 Pac. 661; Tennison v. State, 32 Okla. Cr. 257, 240 Pac. 323.

After a careful examination of the instructions, we hold that they correctly stated the law as applied to the facts in the case. No fundamental or prejudicial errors appear in the record.

The judgment is affirmed.

CHAPPELL and EDWARDS, JJ., concur.