## WALLACE BRADLEY v. STATE.

No. A.-9064.   Dec. 2, 1937.

(74 P. 2d 126.)

204

C. B. Leedy, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and Chas. B. Leedy, Co. Atty., for the State.

BAREFOOT, J.   The defendant was charged jointly with Lee Kratz by information with the crime of forgery. They were tried, Lee Kratz was acquitted, and the defendant was convicted and sentenced to serve a term of 3 years in the reformatory at Granite, and has appealed.

The evidence reveals that the defendant was married, was 27 years of age, and had three children; that he was the son of Mrs. Nellie Bradley of Harmon, Okla.; that his father, Joe Bradley, died in November, 1932, without a will, leaving property consisting of 640 acres of land to his children and 320 acres to his wife. All of this property had been turned over to the mother, Mrs. Nellie Bradley, by her children, including the defendant, and she had the exclusive management and revenue from the same.   The defendant had, since the death of his father, upon numerous occasions, written checks upon the Farmers & Merchants Bank at Arnett, Okla., where his mother kept her bank account.   Sometimes he would sign her name, "Nellie Bradley," and at other times would sign the name, "Nellie Bradley by Wallace Bradley."   The bank did not pay these checks, but his mother had always

taken them up, sometimes by paying them at the bank and sometimes by giving her check to the parties to whom the checks were made payable. On the 22d day of June, 1935, the defendant went to a filling station, in company with Lee Kratz and his wife, Pearl Kratz, in the town of Shattuck, Ellis county, Okla., procured a blank check of the Farmers & Merchants Bank of Arnett, and filled it out for $500 and signed his mother's name, "Nellie Bradley," to the check. Soon thereafter he cashed this check at the Shattuck National Bank, and was paid $250 cash thereon and given a cashier's check for $250 additional. On the same day he and Lee Kratz and Pearl Kratz drove to the town of Gage, Ellis county, and there at the bank he cashed and received $250 upon the cashier's check which he had previously received at Shattuck. He, in company with Lee Kratz and his wife, immediately left for Oklahoma City, ostensibly for the purpose of buying polo ponies, and in which Lee Kratz was to assist him. The evidence further reveals that instead of buying polo ponies all the money was spent in a few weeks having a gay time in Oklahoma City and other places.

The evidence of Mrs. Nellie Bradley, the mother of defendant, which was relied upon by the state to sustain the charge of forgery against the defendant, was as follows:

"Q. Please state your name to the court and jury. A. Mrs. Nellie Bradley. Q. Are you the mother of Wallace Bradley? A. Yes, sir. Q. Where do you live, Mrs. Bradley? A. At Harmon. Q. I will ask the reporter to mark this instrument state's exhibit No. 1. Now I hand you state exhibit No. 1, Mrs. Bradley, which has been marked for identification as state's exhibit No.1, and ask you to look at this and see if you ever saw that instrument before? A. Yes, sir. Q. Is that your signature on the bottom of the check? A. No, sir. Q. Did you authorize

your signature on that $500 check? A. No, sir, not for $500. Q. When did you first know that that $500 check was written? A. When they sent me a statement from the bank. Q. Do you mean a protest notice? A. Yes, sir, from the Farmers & Merchants Bank. Q. Did you know who wrote it? A. No, sir. Q. I will get you to state whether or not that Wallace Bradley denied writing that signature at the time of his arrest, there in your house? A. Well, no, not that I remember. Q. The sheriff was there, wasn't he? A. Well, he came and got him. You came in the same time he did. Q. Would you say that he didn't deny writing the check? A. Well, no, I don't know. I don't remember if that is what he said about it. I didn't see this check at that time. I didn't know anything about it. Q. Had you asked him about it, whether or not he had written this check? A. No, sir, I didn't know anything about this check at that time. I only knew about the $100 check. Q. He also wrote a $100 check on you? A. The one, yes, sir. The check that was settled yesterday. When he was arrested I didn't know anything about this one, this one came in afterward. Q. Now I will ask the reporter to mark this instrument state's exhibit No. 2, and this one No. 3 and this one No. 4. Now I will hand you state's exhibit No. 3, and ask you to examine it and state—(Interrupted) By Mr. C. B. Leedy: Now we object to that as incompetent, irrelevant and immaterial and no part of the prosecution in this case, and does not tend to prove or disprove any part or portion of this case. By the Court: The objection is overruled. By Mr. C. B. Leedy: To which the defendant Bradley excepts. Mr. Barnett: The defendant Kratz mades the same objection. By the Court: The objection is overruled as to the defendant Kratz. By Mr. Barnett: To which the defendant Kratz excepts. By Chas. B. Leedy: Q. Is that your signature? A. No, sir. Q. Did you authorize that signature? A. No, sir. * * * Q. When did you first find out that Wallace had written this $100 check? A. When I got a statement from the bank. Q. When the bank sent you a protest notice? A. Yes, sir. Q. Did you ever give anyone, Mrs. Bradley, authority to write a $500

check against your account? A. No, sir. Q. You carried your deposits in the Farmers & Merchants Bank here at Arnett, didn't you, and do now? A. I have carried an account in both banks. Q. I mean on the 22d day of June, this year; you carried your account here at the Farmers & Merchants Bank in Arnett at the time, didn't you? A. Yes, sir. Q. Did you ever instruct the Farmers & Merchants Bank, at any time, not to pay any checks written against your account by Wallace, or any one else? A. No, sir, not for sure; when I first commenced doing business there again I taken up checks that they held for me, and I taken them up. There are no checks out that I know of. Q. Those checks that you took up, those were checks that had been written against your account by Wallace and payment on them refused and sent back to the payee, weren't they? A. No, sir, I paid some right in the bank. Q. Well, you never have withdrawn that instruction as to the bank, have you? A. I don't remember. Q. Would you say you have? A. No, sir, I wouldn't. By Charles B. Leedy: That is all.

"Cross-Examination.

"By C. B. Leedy: Q. Mrs. Bradley, on behalf of Wallace, is Wallace Bradley your son? A. Yes, sir. Q. Is your husband living? A. No, sir. Q. When did he die? A. Three years ago the 9th of last October. Q. At his death did he leave a will? A. No, sir. Q. Did he leave any property? A. Yes, sir. Q. After his death, you may state what was done with the bigger part or share of this property? A. We worked it, is all. Q. Well, what was done with those shares? A. It is still there; 640 acres to the children. Q. Well, did you receive an instrument, or deed, for their share of that land? A. They deeded me a life estate in 640 acres and I have a warranty deed to 320 acres. Q. In addition to this 640 acres? A. Yes, sir. Q. Now, ever since the death of your husband, Joe Bradley, has your son, Wallace Bradley, at different times issued checks and signed your name to them? A. Yes, sir. Q. Have you paid each and all of those checks? A. Yes, sir, I have. Q. The $500 check now in question,

involved in this action, you may tell the jury whether or not you tried and offered to pay it? A. Yes, sir, I have. Q. Now, have you authorized him, or allowed him to check on your account during the period since your husband's death? A. At times I have, yes, sir. Q. Did you ever tell him not to write checks on your account, that you recall? A. Not that I remember. Q. Now when you did authorize him to write checks on your account, did you state any amount of the checks he should write? A. No, sir, I don't remember that I did. I didn't expect him to write much of a check. Q. He never did that, did he? A. No, sir. Q. But you recall at this time that when you received the notice of protest that this was one of Wallace's checks, that you immediately came to the bank and offered to pay it? A. Yes, sir, when I received the writing. Q. And you came in and wanted to pay it at that time? A. Yes, sir. Q. Then what conversation did you have when you first came into the town of Arnett, after receiving that notice? A. I talked to Mr. Homre. Q. Mr. J. J. Homre? A. Yes, sir. Q. He is the President of the Farmers & Merchants Bank? A. Yes, sir. Q. Did he allow you to pay the check? A. No, sir. Q. What did he say about it? A. Well, he said he had two other checks there, but he said he wouldn't let me pay them. He had them pinned to this check, there were two or three of them. I asked him to let me see them and why he wouldn't let me pay them and he said he had no right to let me see them. Q. And he wouldn't let you see it? A. That was the $100 check. Q. Did he show you the $500 check? A. Yes, sir, he did, when it came in. Q. Well, did you then offer to pay Mr. Homre? A. Yes, sir, I told Mr. Homre that I wouldn't let the bank lose it; that I would pay it, and he said for me to go and see Mr. Stuart. Q. Mr. Homre told you to go and see Mr. Stuart? A. Yes, sir. Q. In the Shattuck National Bank? A. Yes, sir. Q. Well, did you go and see Mr. Stuart? A. Yes, sir, I went up there the next day. Q. Well, after you got there, what did you do? A. I went in and talked to Mr. Stuart; on the $500 check Clyde and I went in. When I talked to him about the $100 check he talked

favorable. When I got notice of the $500 check I went and talked to him and he said no I couldn't settle it no way. Q. What else did he say? A. He said he thought that the boy should be punished and he owed that to the banking business and to the public, and so on. By Mr. C. B. Leedy: That is all.

"Redirect Examination

"By Chas. B. Leedy: Q. Have you attempted to pay Mr. Homre for the check? A. Yes, sir. Q. You had the money there to pay it at that time? A. No, sir, but I could get it. Q. Now you say he showed you the $100 check? A. Yes, sir, he took it out of a drawer there and showed it to me. Q. When did you receive the notice of protest? A. I think the notice came in the mail into Harmon on Monday morning and I came on to Arnett to see about it in the afternoon. Q. Do you remember the date on the protest notice? A. No, sir, I don't; I have them both at home. Q. I hand you state's exhibit No. 2, which has been identified and ask you if that is a copy of the protest notice on the $500 check, which you received? A. Yes, sir, it is. Q. And what is the date of protest thereon? A. Well this is the 21st of June; is this right. Q. Now you didn't receive—when did you receive the protest notice; did you say on Monday? A. I think so. Q. All right, now state whether or not that would be on the 24th day of June, this year? A. I don't remember. Q. The check was issued on the 18th of June, wasn't it? A. I don't know that. Q. Now you say you went from the Farmers & Merchants Bank to Shattuck; did Mr. Homre show you the $500 check there too? A. It wasn't there at that time, the $500 check wasn't. Q. Did you go directly from the Farmers & Merchants Bank to Shattuck? A. Not until the next day. It was after five o'clock when Clyde came after me and the bank was closed. I had come down on the bus and didn't have any way to get over there until Clyde came, and when he came it was too late to see anybody about it that day. Q. Did Mr. Stuart tell you that for the benefit of the public he wouldn't settle? A. That was on the $100

check he told me that. Q. How many children have you, Mrs. Bradley? A. I have five, and a grand-daughter that takes her mother's part of the estate. Q. How much money have you given Wallace as his part of the estate to date? A. I don't know; I haven't given him very much. Q. You say he has written several checks on you? A. Yes, sir. Q. And you have taken them up? A. Yes, sir. Q. They weren't paid through the regular channels of banking business, were they? A. Some of them were. Q. You had instructed the Farmers & Merchants Bank not to pay any checks excepting those checks bearing your signature, had you not? A. When the checks came in they would hold them and I would go and pay them. I didn't have anyone that I could depend on for doing business after Mr. Bradley died. Q. But these checks were just taken up, and not paid through the bank? A. Just taken up there, yes, sir. By Chas. B. Leedy: That is all.

### "Recross Examination

"By C. B. Leedy: Q. When checks came in that he had written, you wanted to come in and see them and take them up, is that right? A. Yes, sir. Q. But when you first began banking there you told them not to pay any checks unless they bore your signature? A. Yes, sir. Q. But always when checks were written you came in and paid them? A. Yes, sir. Q. And you wanted to handle any other checks written on you in the same way? A. Yes, sir. By C. B. Leedy: That is all.

### "Redirect Examination

"By Chas. B. Leedy: Q. Did you instruct the Farmers & Merchants Bank to hold all checks that Wallace had written against your account; to hold them until you could come in and pay them? A. I never talked to anyone except Mr. Homre. By Chas. B. Leedy: That is all."

The defendant, testifying in his own behalf, testified as follows:

"Q. Since that time, the death of your father, have you issued and signed checks on your mother? A. I have.

Q. At various times? A. Yes, sir. Q. And in various amounts? A. Yes, sir. Q. Did your mother ever at any time advise you that you could not, and should not, write any more checks on her? A. No, sir, she did not. Q. On or about the 22nd day of June, 1935, did you write a check on your mother for $500? A. I did. Q. Where was that check written? A. At Shattuck, at the Santa Fe Cafe. Q. What did you do with that check? A. I took it to the bank and cashed it. Q. What bank? A. The Shattuck National Bank. Q. When you went in there did they ask you any questions about that check, or in regard to the signature thereon? A. They did not. Q. What did you call for, cash? A. $250 in cash and a cashier's check for $250. Q. At that time, at the time you signed and delivered the check there, how was the check signed, whose name? A. Nellie Bradley. Q. Who signed that name to that check? A. I did. Q. How did you sign the other checks that you wrote on your mother? A. Most of them just Nellie Bradley. Q. Just Nellie Bradley? A. Yes, sir. Q. You didn't sign Nellie Bradley, by you? A. Maybe I did a few, but I don't remember. Q. But practically all checks you wrote on your mother, you signed them straight Nellie Bradley, the same as you signed this one? A. Yes, sir. Q. Did the bank hesitate about paying it? A. No, sir. Q. At the time you obtained that money, did you obtain it for the purpose of defrauding the bank? A. No, sir. Q. Or cheating them out of any money? A. No, sir. Q. Was it your intention or purpose to get this money and pay the bank? A. No, sir. Q. Or to get the money and think your mother wouldn't pay it? A. No, sir. Q. You had no intention or thought to cheat anybody? A. No, sir. Q. At this time, you haven't seen the bank relative to making a settlement? A. No, sir. Q. Do you know about your mother, what she had done? A. She said she had tried to. By the Court: Don't tell what your mother told you. Q. Now has your mother, at any time, or since this check was written by you, informed you not to write checks on her account? A. She has not. Q. Up to this time? She hasn't? A. No, sir. Q. Now all the money

212

you got there at the time was on your mother's check that you had signed, just as you had done here the last two or three years? A. Yes, sir. By C. B. Leedy: That is all, you may examine."

The defendant demurred to the evidence of the state in this case, and made a motion for a directed verdict, which was overruled by the court and he excepted. The first question raised by the defendant is that under the facts as shown by the above statement the defendant is not guilty of forgery under the law. This question has given us no little concern. Forgery has been defined by this court, in an opinion by Judge Doyle, in the case of Wells v. Territory, 1 Okla. Cr. 469, 98 Pac. 483, 486. After quoting the statute on forgery (22 Okla. St. Ann. § 404) he says:

"The foregoing provision sets forth the offense sought to be charged by the indictment in this case; and by this provision, the gravamen of the offense is the sale, exchange, or delivery of the instrument for a consideration, knowing it to be forged or counterfeited, with the intent to cheat and defraud."

We have carefully examined the instruments given by the court, and they are exemplary as far as they go. They set out the information under which the defendant was charged; the statute under which the prosecution is based; forgery is defined, and the court then charges the jury:

"Before one can be convinced of the sale of forged evidence of debt, there must be an intent to cheat and defraud and a knowledge of the falsity of the instrument."

To our mind the court should have gone a step further and charged the jury:

"One of the questions necessary for you to determine in considering the present case is whether or not Wallace

Bradley, the accused, had or honestly and in good faith believed he had authority to sign the check in question in this case. For if he did have such authority, or honestly and in good faith believed he had the authority, his intent would not have been a fraudulent one and he could not have been found guilty of the crime with which he has been charged, and, if on the other hand you should believe that the defendant Wallace Bradley had no authority to sign the check in question, or that he did not honestly and in good faith believe that he had such authority, and that he signed the same fraudulently and with intent to defraud the bank as charged in the information, your verdict should be a verdict of guilty." See State v. Thomas, 6 Boyce 195, 97 A. 869.

This was the very defense that was being made by the defendant. The defendant has a right to have a clear and affirmative instruction given to the jury applicable to his testimony, based upon the hypothesis that it is true, when such testimony affects a material issue in the case. Shears v. State, 20 Okla. Cr. 193, 201 Pac. 816. He claimed that he had authority from her to write checks and to sign her name to them. While testifying that she did not give him authority to sign the specific check relied upon in the prosecution of this case, her testimony was to the effect that she had given him authority to sign checks, and that she had always taken them up, either at the bank or in the hands of the party to whom they had been issued, and that she had made an attempt to pay off the check in this identical case, at both the Farmers & Merchants Bank at Arnett and the National Bank at Shattuck, but was not permitted to do so by her banker who desired to prosecute the defendant. No doubt the defendant had done wrong, and the banker was right in thinking he should be stopped from imposing upon his mother, by writing checks upon her account and spending the money seeking idle pleasure. But she was his

mother and if she had given him authority to write the check in question as he contended, or if he honestly believed that he had such authority, and her acts and conduct in the past had been such that would cause a reasonable and prudent person to believe that he had such authority, then certainly this question should have been submitted to the jury for their determination as to whether he had the authority as he contended, or if from all the evidence in the case (including that of Mrs. Bradley), he did honestly and in good faith believe that he had such authority. The defense submitted by the defendant was not presented. It is true that defendant should have submitted a requested instruction covering his theory of the case as above outlined, and we have held many times that it was his duty to do so. Walker v. State, 50 Okla. Cr. 333, 297 Pac. 331.

In Williams v. State, 12 Okla. Cr. 39, 151 Pac. 900, 901, the court says:

"Only prejudicial errors raised by exceptions reserved require a new trial, and that is only when we are satisfied that the verdict was contrary to law, or to the evidence, or that injustice has been done, that we are permitted to reverse a conviction, whether or not an exception has been taken in the trial court."

For this reason we could not reverse this case if the evidence was such that in our opinion it justified the conviction of the defendant for the crime of forgery. But we do not believe that, under the evidence of Mrs. Bradley, and the law as applied thereto, the defendant was guilty of the crime of forgery. Under her testimony it does not occur to us that the liberty of this defendant should be taken from him by serving a term in the penitentiary for the crime of which he was convicted. People v. Reinitz (Gen. Sess.) 6 N. Y. S. 672; State v. Lurch,

12 Ore. 95, 6 Pac. 405; Kotter v. People, 150 Ill. 441, 37 N. E. 932; Sweet v. State, 28 Tex. App. 223, 12 S. W. 590; State v. Thomas, 6 Boyce 195, 97 A. 869; State v. Petridge, 106 Wash. 445, 180 Pac. 150.

If it should be deemed advisable by the state to retry this defendant, the jury should be instructed as above outlined, to the end that the jury may pass upon the question of the good faith of the defendant as to whether he had the authority to sign the check, or honestly believed that he had such authority, and if these facts were true there would be no intent to cheat and defraud under the forgery statute of this state. In addition to the above authorities we call attention to the case of Willetts v. Scudder, 72 Ore. 535, 144 Pac. 87, 90, where the court says:

"One of the material facts necessary to constitute the crime of forgery is an intent to defraud. If the plaintiff, when he indorsed the check, acted in good faith and believed that he had a right, as agent of the company, to indorse it, and did not intend to defraud any one, he did not commit the crime of forgery. The signing of another's name to a note or a check without authority is not necessarily forgery. It constitutes that offense only when it is done with intent to defraud.

"The question whether the paintiff indorsed the check with intent to defraud was a question of fact to be determined by the jury from the circumstances relating to the act, as shown by the evidence. It was the province of the jury, and not the court, to determine whether the plaintiff indorsed the check in question with intent to defraud.

"In People v. Wiman, 148 N. Y. [29] 33, 42 N. E. [408] 409, the court says: 'Criminal intent is essential to constitute the crime (forgery), and the testimony bearing thereon is always a question for the jury.'

"In State v. Bjornaas, 88 Minn. [301] 305, 306, 92 N. W. [980] 982, the court says: 'It is elementary that

the animo furandi or intent to defraud, is an essential element of the crime of forgery, or of uttering a forged instrument, which is to be proved or inferred from facts reasonably tending to establish a guilty purpose, and may be negatived by evidence showing the absence of such an intent. * * * As stated in a case very similar on the facts to the one at bar: Where the intent to damage or defraud is a salient and essential part of the case, such intent is not an irrebuttable presumption of law, but is an open question for the jury, to be determined by the facts and circumstances in proof, for the signing of another's name without authority is not necessarily forgery.

"In Agee v. State, 113 Ala. [52] 57, 21 So. [207] 208, the court says, referring to a charge given to the jury: 'This charge withdrew from the jury all consideration of one of the ingredients of the offense alleged (forgery), the intent to defraud, which was a matter of inference from the facts before them, to be drawn or rejected by them, as those facts seem to them to require'.

"In Gooden v. State, 55 Ala. [178] 180, the court says: 'The charge given by the court cannot be supported. It withdraws from the jury all consideration of the intent to defraud—a matter of inference from the acts before them, which it was their province to draw or reject.'

"In Kotter v. People, 150 Ill. 441, 37 N. E. 932, the syllabus in part is: 'On the trial of one for the forgery of receipts, the court on behalf of the people, instructed the jury that, while it was necessary that the defendant should have forged the receipts with the intent to damage and defraud the persons whose names were signed thereto, yet if they found that the defendant forged the receipts, or either of them, then the law would presume that defendant intended to damage and defraud such persons. Held, that it was error to give the instruction.'

"In McCay v. State, 32 Tex. Cr. R. 233, 22 S. W. [974] 975, the court says in part: 'It is not every signing of another's name without authority which constitutes forgery. There must inhere in the act an intent to

injure or defraud. If there is a reasonable and honest belief that the signature will be approved, there can be no forgery.'

"In State v. Gullette, 121 Mo. [447] 457, 26 S. W. [354] 356, the court says: 'Instructions 1 and 2 given on behalf of the state were erroneous in not submitting to the jury the issue raised by the allegations of the indictment and defendant's plea of not guilty, whether the act charged, if done, was done with the 'intent to injure or defraud'."

"In Knowles v. State (Tex. Cr. App.) 74 S. W. 767, the court says: 'Now, if Haney authorized appellant to sign the name, or if appellant believed he had a right to sign the name under all the existing circumstances, he would not be guilty. * * * Upon another trial this matter should be submitted in the charge to the jury.'

"In Regina v. Beard, 34 Eng. Com. L. 659, Coleridge, J., says: 'It is not merely writing another man's name, but writing it without authority and with intent to defraud. But I go further, because I think that if a person had reasonable ground for believing, from the acts of the party, that he had authority to accept, and did in point of fact act upon that, it could not be forgery.'

"Writing the company's name on the back of the check without authority so to do was not necessarily forgery. Such an act, to constitute forgery, must be done with the intention to defraud. Assuming that the plaintiff had no authority to endorse checks belonging to the Scudder Syrup Company, still his indorsement of the check in question did not constitute the crime of forgery, unless he did it with intent to defraud."

In the case of Cornelius v. State, 27 Okla. Cr. 331, 227 Pac. 845, 846, Judge Bessey, speaking for this court, says:

"The defendant now claims that under this state of facts he was not guilty of forgery, but if guilty of any offense it was the offense of false pretense; that where an accused is charged with affixing the signature of an-

other to a written instrument it is a complete defense to a charge of forgery to show that he had authority to do so."

Judge Bessey further says:

"Under some circumstances this contention might be upheld."

But from the peculiar facts in this case he finds that the defendant could not have given such authority by reason of the fact that he was a minor and was intellectually incapable of making a contract; but it seems that when he uses the expression "Under some circumstances this contention might be upheld" he had in mind just such state of facts as exists in the case at bar.

For the reasons above stated, the judgment of the district court of Ellis county is reversed.

DOYLE, J., concurs. DAVENPORT, P. J., dissents.