## JOHN THARP, JR., v. STATE.

No. A-9446. March 17, 1939.
(88 P. 2d 652.)

E. B. McMahan, of Boise City, and Ross Rizley, of Guymon, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Owen J. Watts, Asst. Atty. Gen., for the State.

DAVENPORT, J. The defendant, John Tharp, Jr., was by information filed in the district court of Cimarron county charged with the murder of Rex Gillispie; was tried, convicted and sentenced to serve a term of 25 years in the state penitentiary. The record was properly saved, and defendant appeals.

The testimony on behalf of the state in substance is as follows:

Glenn Capansky:

"I live at Pueblo, Colo., now, but on Thanksgiving Day in 1936 I lived at Kenton, Okla.; I came to a dance in Boise City on Thanksgiving evening in 1936; Sylvia Walker, Betty Easley and Rex Gillispie came with me in a 1930 model Ford coupe; we arrived in Boise City about seven o'clock at night; afterwards we attended the dance; the dance broke up about 1 o'clock in the morning; I have known the defendant, John Tharp, Jr., all my life; he is about 20 years of age; Rex and I drank some wine that night; Rex was not intoxicated; nor was I intoxicated; after the dance we went to a filling station to get some water for our car and started home; going west on Highway 64 we saw the defendant, John Tharp, Jr., on our way out; we first saw him about a mile out of town; the defendant was accompanied by Frank Layton, Burton Black and Ernest Freeman; Frank Layton was driving the car and the defendant was in the right-hand side of the back seat; the car the defendant was riding in passed us, went on down the road and they hailed us and we talked; I do not remember what was said, but we went on down the road and had a little disagreement and I slapped the Layton boy's face; the Layton car had passed us twice going around fast and then slowing up; the roads were dusty at that time; the Layton car was in front of us and it stopped a short distance in front of us; we went up to the car and had a little argument and I slapped the Layton boy on the cheek with my left hand; I told him to go on and mind his own business and I hardly remember what he said, but something about going to get the law after me for slapping him because he was a minor; I think the Layton boy is 15 years old; about all that was said was that we were arguing over the road and

them bothering us; Rex Gillispie at that time was by my side; we came up to the car driven by Layton at about the same time, we then went back and got into our car and started on home; Rex Gillispie did not say anything to the defendant at the time we went up to the car that I recall nor did the defendant say anything to Rex; we went on down the road a mile or two and the Layton car drove in front of us and stopped and the light Ford wouldn't stop as fast as the V-Eight and we bumped into them; there was plenty of dust at that time in the road; we bumped the Layton car hard enough to shake us up; the Layton car then started and we stayed where our car had stopped and they stopped again and we went up to the car; I would say at the time of the second stop the cars were 30 feet or more apart; Rex and I went up to the Layton car, Rex was in the lead, we went up on the left-hand side of the car, when we stopped by the car Rex was on the left-hand side of the car about the middle; it was a four door car; he stopped very close to the car; I was standing east and south of him by his side, I was leaning on his left shoulder with my elbow, looking over his right shoulder; we were both sore and Rex was telling them if they thought they were smart to get out of the car and he would show them they wasn't; he was talking to the whole bunch; he didn't finish talking; he was killed; I don't know who opened the door nor did I see the gun; I do not know who fired the shot; I couldn't see anything but the fire from the gun; it came from the back seat; there seemed to be a ball of fire all over the seat; the shot was fired about a minute after we arrived at the car; I do not know if the defendant, John Tharp, Jr., said anything; I was not saying anything; Rex was talking; I did not see the deceased at any time reach toward the back seat of the car nor did I see him reach toward the front seat of the car; the door to the car opened from the front; after the shot was fired Rex started to fall and fell on the back fender and started down, I grabbed him before he fell to the ground; he was sliding down the fender from the car and I pulled him away from it and he fell down in a sitting position; I asked him if he was hurt and he either said 'Hell, yes, I am murdered,' or 'Hell, yes, I am hit'; I did not hear the defendant, John Tharp, Jr., say anything; another car appeared about that time; the boys were talking and cry-

ing; Ernest Freeman was talking and crying and I told him to shut up and help me with the deceased; we put the deceased in little Bill Wommack's car and brought him to town; I think the Freeman boy is now in New Mexico; I drove back to town in Rex's car; it was a moonlight night; when we stopped the car the lights were on; when we got back to town and before we got to a doctor the deceased was dead and the doctor told me to take him to the funeral home; the man at the funeral home looked at him and told us he was dead and there was nothing we could do."

On cross-examination the testimony of the state's witness Glenn Capansky was in substance the same as in his direct examination.

Sylvia Walker Capansky, a witness for the state, testified:

"I am 16 years of age; I am the wife of Glenn Capansky who just testified; I went to the dance on Thanksgiving evening in 1936 with Glenn Capansky, Betty Easley and Rex Gillispie; we drove a Ford coupe."

The further testimony of this witness is in substance the same as the witness Glenn Capansky, her husband.

Betty Easley, testifying for the state, in substance, stated:

"I am 16 years of age; I live at Kenton, Okla.; I went to Boise City Thanksgiving evening in 1936 with Rex Gillispie, Glenn Capansky and Sylvia Walker now Sylvia Capansky; we were in Rex Gillispie's car."

The testimony of this witness is in substance the same as the testimony of Glenn Capansky and Sylvia Walker Capansky.

Frank Layton, Jr., testifying on behalf of the state, stated:

"My name is Frank Layton, Jr.; my home is at Kenton, Okla.; I am acquainted with Burton Black, Ernest Freeman and the defendant, John Tharp, Jr.; we drove

to Boise City on Thanksgiving evening in 1936 and attended a dance; we were driving a 1935 model Ford; at Kenton before we left for the dance I met John Tharp, Jr., the defendant in this case, he was in town when I first saw him; it was sometime in the afternoon; he got in the car at my home about 6 or 6:30 that evening; John was with me at this time; when we left my home we picked up Burton Black and Ernest Freeman and then drove up to John's house; at no time during the evening or before we started to the dance did I see the defendant with a gun; when we went by John's home he said he wanted to change clothes and get some money; he went into the house and shortly afterwards came out and we drove on to Boise City; we attended the dance and after it broke up we started home; I drank some wine that night; John had not had many drinks; neither John or myself were intoxicated; I do not know exactly when the dance was over but we started home immediately after the dance had closed; I knew Rex Gillispie during his lifetime; about a mile or a mile and a half out of Boise City I saw Rex Gillispie, he was driving a model 'T' Ford coupe; we passed his car; I was driving about 50 miles an hour; we did not crowd his car when we passed it; when we passed Rex someone of the boys asked if they were going to the charivari; Glenn hollowed for us to stop; Glenn got out of the car and came to our car and slapped me; when Glenn got out of his car he just walked up to me and hit me; he just walked up to our car cursing; we had had no trouble at the dance; I don't know why he was cursing me; he did not say anything about us throwing dust into his face; after he slapped me Glenn got into the car and they went on; I started to go back to town and report him, but the boys in my car talked me out of it; we went on down the road and when we caught up with them I went around them; when the boys talked me out of going back to Boise City I went on towards home and again passed the Gillispie car and stopped again; I stopped suddenly; I had good brakes; the car was kicking up considerable dust while it was running; when I stopped rather suddenly Rex's car bumped into me; not too hard; after it bumped I drove on down the road about 100 or 150 yards; Glenn drove up and stopped about 20 feet from my car; my

lights were on and his lights were on; it was a pretty light night; the moon was shining; after they stopped Glenn and Rex got out of their car and came up to our car and Rex opened the door and tried to pull me out; Rex was in the lead; as soon as Rex came up to the car he grabbed me by the arm and tried to pull me out of the car I was driving; Burton Black was on my right and on the back seat was John Tharp, Jr., and Ernest Freeman; at the time Rex took hold of me Glenn was standing right by Rex a little east of Rex; I don't remember what Rex said at the time; he took hold of me; he acted like he was about half mad; I do not know if he said anything about us passing them and kicking dust into their faces or not; he cursed me; John Tharp, Jr., said something at the time but I did not catch it; when Rex took hold of me I braced myself so he couldn't pull me out of the car; Rex turned me loose and I heard John say something, then I turned around and saw the gun; I do not know what it was that John said; at that time Rex just backed off and I closed the door; after I closed the door he walked up toward the car a little and at the time I heard the defendant say something; Rex was standing at the door of the car; I would say a foot and a half or two feet from the car; I turned around to the left and saw the gun in John Tharp, Jr.'s hand; I turned and looked on down the road, next I heard a shot; after he fired the shot I turned and looked out the window I saw Rex fall on the left hind fender, immediately after I heard the shot; I heard the defendant say something but I do not recall what it was; I thought he said something about shooting him, 'What if I have killed him?' or something like that, I don't remember just what he said; after Rex turned loose of me I was not looking toward the back of the car; at the time the shot was fired I would judge that Rex was one and one-half or two feet from our car; I had not seen the gun at anytime that evening before the shot was fired; nor did I know that John Tharp, Jr., had a gun; at the time I saw the gun it was just pointing out the window; it was pointing kinda in the direction of Rex; when I saw the gun it was pointing out the front window of the car on the left-hand side; after Rex fell he was picked up and put in Bill Wommack's car and taken back to Boise City; I

turned the car around and started back to Boise City but as I turned a car ran into us and damaged our car so I could not proceed to Boise City; the defendant got into a car with Wesley Collins; I heard the defendant say something but I couldn't catch what he said, I thought he said 'I might have killed him' or 'What if I have killed him.' I did not return to Boise City that evening."

On cross-examination the witness stated:

"I am 15 years of age and I have known John, Jr., all his life; I have known Rex Gillispie all his life; Burton Black, John Tharp, Jr., and Rex Gillispie always ran together; they were good friends and had never had any trouble; they went around together; I saw them at the dance the night Rex was killed; I drove Burton Black, John, Jr., and Ernest Freeman to Boise City that evening; I drank some wine that evening but I was not intoxicated; no one in our crowd was intoxicated; I heard the announcement made at the dance about the charivari but did not know where they said it would be; we discussed among ourselves as to whether or not we would go to the charivari; when we passed the car in which Rex Gillispie was riding it was not our intention to annoy them or kick dust in their face; I thought nothing about passing them except that I wanted to go on home or to the charivari; when they passed us, we asked them if they were going to the charivari and Glenn ask us to stop; they got out of their car and came up to our car; Glenn cursed me and called me names and reached over and slapped me; I wanted to go back to town and report him for hitting me but the boys in the car with me persuaded me not to do so; the car in which Rex was riding drove half a mile before we passed them again; they hollowed for us to stop, got out and came up to the car; Rex grabbed me by the arm and tried to pull me out of the car; I think we had passed Rex's car three times when Rex halloed for us to stop. I stopped suddenly and his car bumped into our car; after he bumped my car I drove on up the road a short distance; they came up to my car and he was cursing me; reached in and got hold of me and tried to pull me out; I braced myself so that he could not pull me out; that was when I heard Jr. say something but I don't know what he said; when Rex

turned loose of me I pulled the car door shut; when I closed the car door Rex stepped back and then he came up to the car and that was when I saw the gun in John Jr.'s hand; I pulled the car door shut as I saw the gun in Jr.'s hand; Rex walked up about one and a half feet of the car; he walked up to the car about where the handles meet; I never did hear the back door open, I learned afterwards it was opened; I was looking ahead when the shot was fired; I do not know whether Rex when he went up to the car grabbed the gun or not; Burton Black was sitting in the front seat with me; Ernest Freeman was in the back seat right behind me on the left-hand side of the seat."

The testimony of all the state's witnesses shows that the deceased and the defendant had been reared in the same neighborhood and had been friends from childhood and so far as the witnesses knew the deceased and the defendant had never had any trouble and on the night of the killing they were together, friendly and all seemed to enjoy the dance. The evidence all shows that there had never been any trouble between the deceased and the defendant, except the trouble that occurred on the highway between Boise City and the home of deceased and defendant in or near Kenton, Okla.

Burton Black, testifying for the state, stated:

"I am 20 years old and live at Kenton, Okla.; I attended the dance at Boise City on Thanksgiving night in 1936; I drove to the dance in Frank Layton's car with John Tharp, Jr., and Ernest Freeman; I did not see the gun in the car after we came over to Boise City; we drank some wine; I was not intoxicated; when the cars stopped the last time I do not remember whether or not the carlights were on in Gillispie's car or not, the lights were on in my car; when Rex came up to the car he took hold of Frank and tried to pull him out of the car and John, Jr., slid forward on the seat and had a small gun in his hand; he stuck the gun up to about the top of the back seat, I think; at that time Rex was standing at the front door of the car; the door was opened; John, Jr., had slid forward to the front of the car seat when I first saw

him; I saw Jr. fire the shot; I don't know if he said anything before he shot; at the time the shot was fired Rex was there, right in the door of the car; I think that Rex's legs were touching the running board of the car at the time John fired the shot; Rex might have been two or two and a half feet from Jr.; I cannot tell at this time where the defendant was sitting when he fired the shot; I saw Rex reach toward the gun but I do not know whether or not he touched it; I do not know if the left back door of the car was opened or closed when this shot was fired; immediately after the shot was fired I heard the defendant say 'Oh! My God, I shot old Rex what if he dies'; he did not say why he shot him; Rex fell back in a southeasterly direction; I went on home after the shooting; did not return to Boise City; I still live in the same neighborhood near Kenton where I was living at the time of the trouble."

The testimony on cross-examination of the witness is in substance the same as his direct examination.

Charles Shaw, testifying for the state, stated:

"I live at Boise City; I am an undertaker; I saw the body of Rex Gillispie on the night of the 27th or the morning of the 28th of November, 1936. It was brought to my place of business; I examined the body and found one bullet hole in the chest and then also one between two of the fingers, between the little finger and the one next to it on the right hand; I couldn't tell just where the bullet passed through there was no powder burns on the hand; the body was dressed when I first observed it; there was no powder burns on the clothes he had on; I couldn't tell the color of the shirt he had on; the wound on the body was on the left side of the chest, possibly an inch and a half below the nipple and a little to the right; I did not make an examination to tell which way it ranged; he was dead at the time I saw the body."

State's Exhibit No. 1 was presented to the witness and he stated that it was the jacket that Rex Gillispie had on the night the body was brought to his undertaking establishment. The jacket showed a bullet hole on the left side and was introduced as evidence over the objection of the defendant.

On cross-examination the witness stated that the wound on the little finger was at the first joint and about half way between the first and second joint on the other finger. He further testified: "I don't know which way the bullet entered; the wound seemed to be more jagged on the inside than it was on the outside."

Witness was asked by the defense attorney as to his evidence given at the preliminary hearing, as follows:

"By the Court: Q. What was the condition of the wound on the hand as to one side being smooth and the other being jagged? A. It was somewhat jagged on both sides, not exactly smooth on either side. By Mr. McMahan: Q. You didn't observe any particular difference that it was more smooth on one side than the other? A. No, sir. Q. Do you remember those questions being asked you and you giving those answers at that time? A. No, sir, I don't remember."

He further stated: "I don't remember if the wound was on the first joint but I know it was on the second joint of the little finger."

Dr. Harry Hall, testifying for the state, stated:

"I reside in Boise City; lived here in 1936; I did not know Rex Gillispie during his lifetime; the first I ever saw his body was the night it was brought to my residence on the porch, approximately two thirty in the morning of the 28, the morning after Thanksgiving in 1936; he was dead when the body was brought to my place; I examined the body and found a gunshot wound in the left chest near the left nipple; which had penetrated the heart; that wound caused his death; I did not make a minute examination; I saw the body again at the undertaking parlor; I noticed again the bullet wound; I did not observe any powder burns about the body; he had on some kind of a jacket, I couldn't tell what kind it was."

Jake Allison, testifying for the state, stated:

"I live in Boise City; I was the sheriff of Cimarron county in 1936; I came to Boise City some time in the

afternoon of the next day; I learned of the death of Rex Gillispie when I got back to town; I saw the body later that afternoon; Mr. Shaw, the undertaker, delivered some clothes to me. State Exhibit No. 1 was shown to the witness and he stated that it was the jacket that was delivered to him after he returned to Boise City. I kept this jacket in my possession until I went out of office in 1937, then I delivered it to Mr. Barrick, who is now the sheriff of Cimarron county; I am acquainted with the defendant; have known him for ten or twelve years since I came to the county; I saw the defendant in the county jail; Mr. Adee and Mr. Leedy were the jailers at the time; I asked him how it came about, if they were all drunk, and he said they wasn't. He said Rex came up to the car and was scuffling with this boy and it looked like somebody had to do something and he didn't know anything else to do except what he did; I talked to the defendant about five or ten minutes; I don't recall if I asked the defendant how he happened to point the gun at Rex; the defendant did not say whether he tried to stop the deceased by pointing the gun at him or by shooting at him."

I. E. Hill, a witness for the state, testified as follows:

"I live in Boise City; I am 31 years of age; I was acquainted with Rex Gillispie during his lifetime; last time I saw him was at the undertaking establishment; I saw the wound on his body, there was a bullet hole in his left breast a little below the left nipple, a little to the right; I noticed a wound on his hand; I have observed in all bullet wounds the edge of the wound where it entered is smooth and where it leaves the body it is rough and more jagged; in my opinion the bullet entered the hand on the inside, because of the smoothness of the edge of the wound on the outside and the less smoothness on the inside; the bullet passed between the fingers, the wound was a little deeper in the little finger than the finger next to it and between the fingers where the bullet went through the skin was slightly reddened, but on the finger, on each side it was smooth and the edges of the skin slightly depressed; on the other side there were a few little breaks in the skin where it had the appearance of being pushed out; there was no powder burns

on the hand; there was no discoloration discernable; I had on my glasses."

On cross-examination it developed that the witness had been practicing law since 1914.

"I have never been a ballistic expert of any kind; I have served as county attorney for this county quite a while; I have examined several wounds since I was county attorney; I have probably examined the bullet wounds in eight bodies; the undertaker had not embalmed the body when I first saw it; no charges had been filed against the defendant at that time; the wound on the little finger was over the right first joint; on the other finger it was between these two joints closer to the knuckle."

Neal Adee, testifying for the state, stated:

"My name is Neal Adee; I live in Boise City; have lived in this county about thirty years; on November 26, and 28, 1936, I was under sheriff, Jake Allison was the sheriff at that time; I did not know the deceased, Rex Gillispie; I was not acquainted with John Tharp, Jr., at the time of this alleged difficulty; I saw the body of Rex Gillipsie at the undertaking parlor; Mr. Shaw and I got in the car and led the party to a Doctor; I did not see the body at that time; I might have seen it in the car, but I didn't see it examined; Mr. Board was the county attorney at that time; I saw the defendant that evening when the body was taken to the undertaking parlor; had a conversation with him; I helped to take the body in and asked Capansky, 'Is there any of you boys that know anything about this,' and he said he did, and I asked him 'Who did it?' and he said, 'I do.' Shortly after I asked Capansky this question the defendant came out and there was several of the boys around there and they huddled up around him and said to him, 'Don't worry, you will come out all right;' I asked him if he was the one who shot him; he didn't give me a direct answer, he just said: 'Rex and I were the best of friends.' Then I asked him why he shot him and he said something about Rex going to whip the boy, or to keep him from whipping the boy; I understand it was the Layton boy; I searched him and he didn't have any gun and I asked what he did with the gun and he said he threw it away on the side

of the road; neither of the parties were able to tell me where he threw the gun away except about four miles out; they told me as best they could; he did not tell me he was in a scuffle with the deceased when it happened; Mr. Board talked to him in my presence; after he questioned him he said he didn't know anything else to do; we went over the next morning and found the gun; some boys had found it and told me where it was; it had not been moved. The gun was not loaded and I could not find any shells on the ground or near the car tracks. The gun was introduced as evidence, and is an automatic 32."

On cross-examination his testimony was the same in substance as the direct examination.

H. W. Barrick, a witness for the state, testified:

"My name is H. W. Barrick; I live in Boise City; I am the sheriff of Cimarron county; my tenure of office began on January 4, 1937; Mr. Jake Allison preceded me as sheriff; State Exhibit No. 1, is a jacket turned over to me by Mr. Allison when I went into office; it has been in my possession all the time since then, locked up."

State's Exhibit No. 1 was admitted in evidence over the objection of the defendant.

Witness was then asked by the state if he had any experience in observing gunshot wounds and he answered that:

"I have. I have examined several wounds; I was in the army and observed it there and noticed that where it enters it goes in and leaves a little round hole, and where it comes out it tears a large hole; by this you can determine what side the bullet enters the flesh, if it passes through; I have had experience in the matter of determining what distance an object must be from the gun in order to powder burn an object; I made a test with this gun and have that test with me; I put a paper on a board and measured the distance off and fired from that distance; State Exhibit No. 3 is a test of that gun on twelve inches. This was objected to by defendant's counsel, and objection overruled. It is a test I made at twelve inches; I put this paper up on a board and then meas-

ured off a distance of twelve inches and fired at that distance. State's Exhibit No. 4 is a test I made from this gun at 24 inches; I have made three more tests but it showed no powder burns; showed some but not as much as either of these; I made these tests last Tuesday, with the county attorney and my deputy."

These Exhibits 3, 4 and 5 were offered as evidence and objected to by the defendant, objections overruled, and the defendant reserved exceptions.

The witness further stated:

"The black spots on the paper represent powder burns, and the writing on the margin is the distance the gun was from the paper, I drive a Ford V-8, the distance between the doors in front of the back seat is 52 inches; the distance from the inside of the right hand back door to the running board from one corner of the seat of a 1935 Model Ford V-8, to the fender or running board on the other side of the front door is six feet."

The witness, on cross-examination, stated:

"I have never been a ballistic expert of any kind; have made tests prior to this as to the effect of gunshot wounds; I do not know what kind of bullet was in the gun; I suppose the condition of the flesh would have a lot to do with the kind of hole it made where the bullet went in and came out; if the flesh was soft, flabby flesh it would tear, and the hard flesh wouldn't; the kind of bullet used has a lot to do with it; a soft nosed bullet will tear a larger hole than a steel one; the kind of powder would have a lot to do with the extent of powder burns, black powder burns worse than smokeless powder; I used smokeless powder in making these tests."

C. C. Finch, testifying for the state, stated:

"I live at Boise City; I was a night watchman in 1936; I saw the body of Rex Gillispie; there was just one wound in the body; that was in the chest; I believe there was one in the hand, the wound on the hand was between the little finger and the one next to it; the wound was not as clean on the inside as it was on the outside, it had more ragged edges."

On cross-examination witness said: "When I saw the body it was at the funeral home." On re-direct examination the witness stated: "There was no powder burns on the hand or the body."

The foregoing is in substance all the evidence introduced on behalf of the state.

The defendant, John Tharp, Jr., testifying in his own behalf, stated:

"My name is John Tharp, Jr.; my home is at Kenton, Okla.; I have lived there all my life; Mrs. Tharp, my mother, lives on a small ranch out of Kenton. My father is not living; his name was John Tharp. I knew Rex Gillispie during his life; we were in school and on a number of camping trips together; we were in school together 8 or 10 years and were always the best of friends; I believe he was the best friend I ever had.

"I recall driving to Boise City on Thanksgiving night of 1936 for the purpose of attending a dance; I came with Frank Layton, Burton Black and Ernest Freeman; Rex Gillispie came to the dance in a Model A Ford, accompanied by Sylvia Walker, now Capansky, Betty Easley and Glenn Capansky; they were in Rex's car; I was riding in Frank Layton's car; we left Kenton for Boise City about 6 o'clock in the evening, went by my home so I could change clothes and get some money; at that time I had an automatic pistol in my possession, it belonged to Elmer Welch; he had been farming for us and then moved away about six miles north of our place. One day I came by his place and he mentioned to me he had a pistol he would like to trade for a shotgun, I knew he wasn't acquainted very well around there and I volunteered to take it, before I left, and trade it for him; he gave me the gun and I went home; I had had this gun about three or four weeks before the trouble; I took the gun with me to Boise City; I don't know why I took the gun with me, I carried it once before that night; the gun was loaded when I left Kenton that night; when I got the gun it had three shells, I fired one at a rabbit and lost the other; I put the gun in the pocket of the car before we went to the

dance immediately after we had stopped our car at Boise City; the next time I got hold of the gun some one handed it to me out of the car pocket; that was immediately after we had the first trouble with these boys; I put the gun in my pocket; we remained at the dance until it broke up, which was a little after 1 o'clock in the morning; I had always been a good friend to the boys in the two cars; had never had any trouble with either of them; we started back to Kenton immediately after the dance closed; we ate our supper at a cafe in the north end of town; Rex also ate his supper there at the cafe; during the dance I had several conversations with Rex, all the parties seemed to enjoy themselves; I heard them making an announcement about a charivari at John Onack's place; I did not know where John Onack lived; some of the boys wanted to go by and stop at the charivari; it was immaterial to me; the car driven by Rex Gillispie left town ahead of our car; we passed their car about a mile out of town; Frank Layton was driving the car I was riding in, I was on the right side in the back seat; Burton Black was in the front seat directly in front of me and Ernest Freeman was riding in the back seat with me; after we passed the car Rex was driving some one in the car asked them if they were going to the charivari; I did not hear any reply; after we had passed Rex's car about three times we stopped, some one in the car holloed at us, I couldn't tell what they said and Frank stopped the car; Glenn Capansky got out on his side and came over to our car, and Rex got out on his side and came to the center of the highway, then Glenn jerked the back door of our car open and started to cursing and wanted to fight, then he opened the front door and said a few words to Frank and then hit him. Frank said something back to him but I didn't hear what he said, all during this time Rex was standing in the middle of the highway laughing; after Glenn hit Frank they went back to their car and got in; we started on home and passed them again; we stopped our car about three miles on up the road; the reason we stopped Frank wanted to go back and report Glenn hitting him; I told Frank they would be good friends in the morning and to forget about it; about that time the car Rex was riding in bumped our

car, we then drove about 250 or 300 yards and stopped, Frank still insisted he wanted to go back to town and report Glenn for hitting him but we talked him out of the notion; when Rex drove up someone holloed but I do not know what was said; when their car stopped Rex and Glenn got out of the car, Rex was in the lead, he jerked the front door open and said something to Frank, and grabbed him by the arm and I believe he tugged at his arm three or four times. It seemed to me like he was pretty mad, and he was much bigger than this boy and I didn't know what to do; I had this gun in my pocket, and I pulled it out and slid forward in the back seat and showed him the gun. I didn't point it at him or threaten him, I just told him to turn this Layton boy loose; he turned Layton loose, and Frank shut the door; about that time Rex jerked the back door open, and he grabbed the gun, and that is what caused it to discharge. I had no desire whatever to take the life of Rex Gillispie; I had no intention of pulling the trigger or firing the gun at Rex; at the time I procured the gun my intention was to bluff Rex from bothering Frank so we could go home. After I found Rex had been hit, I got out of the car and went to where he was, I started to, and they said they had already taken him to the car of Bill Wommack's, I then walked back to my side of the car; I told Frank his car was faster than the one they put Rex in, and to catch that other car and take Rex back to town; he started to turn around and a big car came down the road and struck him on the side, it blew out one tire, bent the fender and the axle putting the car completely out of running order. I got out of Frank Layton's car to see what damage was done and when I saw it would not go I got in Wesley Collins' car and came to Boise City; I believe Wesley Collins is now living in Nevada; when we got to Boise City we went to the funeral home, and I asked Glenn how Rex was, and he said he was dead. I spoke to Betty and Sylvia about how Rex was, and then talked to Glenn; Mr. Adee was there that night; I talked to him and told him what became of the gun, I told him I threw it away; I think he searched me. I talked with him again about the gun in jail, when my mother came to see me; I threw the gun away after I saw what I had done, I was disgusted, I

was not trying to hide the gun. I also had a conversation with Mr. Allison while I was in jail; he asked me how the trouble came about and I told him a little about it, that I thought by showing him the gun it might stop him, I never did tell Mr. Allison or Mr. Adee I thought shooting would stop him; I did not try in any way to impress Mr. Allison or Mr. Adee that I shot Rex on purpose to prevent him from hurting the Layton boy. We drank some wine in Boise City the night of the trouble; two quarts of wine were purchased that night so far as I know, and there were 8 or 10 boys drinking, neither of the boys were intoxicated."

On cross-examination, the defendant stated:

"I was 21 years old last February; the deceased, I think, was 21 years of age. I am taller than the deceased was, he weighed more than I did; the deceased and I have been good friends all of our lives; I understand the deceased came to Boise City in the afternoon on Thanksgiving in 1936. I talked with Frank Layton about my going with him as I knew he was driving to Boise City; I dropped the gun on one occasion in Kenton, but I was not getting in a car at the time. I have known Elmer Welch, the boy from whom I got the gun for about five years; Welch had moved from our place to another place before the trouble occurred; I went by my home to change my clothes and get some money, the gun was in the trunk at my home, and when I opened the trunk I picked it up and put it in my pocket: I did not tell the boys in the car I had the gun; the party that handed the gun to me got it out of the compartment of the car. Burton Black and Frank Layton, Jr., were riding in the front seat. They have testified in this case; I don't know whether either of the boys in the car with me knew where John Onack lived; I had no interest in the charivari; I had no friends or relatives in the charivari; Rex Gillispie's car started out of town first; we were driving about 45 miles per hour and someone asked them if they were going to the charivari; I did not hear any response, I did not pay any attention to that; there was considerable dust on the road; after we passed them and drove about half a mile we slowed up; none of the boys in the car knew definitely where Onack's house was; we were not trying to play a prank on the occu-

pants of the other car by getting in front and stirring up dirt in their faces; when Rex drove by us he was going about the same speed that we had been driving; when they passed us they speeded up; John Onack's house was about 100 yards from the road; we passed them again and then traveled about 300 yards and then we slowed up again; I don't know why we slowed up; when Layton slowed up we started looking for this house; the coupe caught up with us in a little bit after we slowed up; they holloed to us, I don't know who it was or what they said; when they stopped they were right behind us; they holloed and asked us why we stopped and we told them they had holloed to us; they came to about 30 feet of us before they stopped; Rex and Glenn both jumped out of their car; I am positive Rex got out of the car when Glenn did; Glenn came up to our car and he acted like he was mad when he came up to the car; he did not say 'You boys are running around us and kicking dust in our faces.' He came up and hit the Layton boy; I don't know why he hit him; Glenn just came up to the car cursing and hit him; I was watching Rex because I wanted to see where he was, he and I were good friends; I suppose when Rex was out in the road that he was laughing at Glenn; when they got back to the car they went up the road about half a mile, I don't know what rate of speed they were going then; we didn't talk over this question why Glenn hit Frank; Frank wanted to drive back to Boise City and have the sheriff arrest Glenn for hitting him; I knew Glenn Capansky was mad; I don't know why the Layton boy stopped; when they ran into our car we pulled on up the road; in a way I was afraid of Capansky as I was not big enough to whip him; if I had been driving I would have driven on and left them; I advised the Layton boy to do so; after they bumped into us we drove on for a short distance, the Layton boy was going back to report Glenn hitting him is why we slowed up and got bumped; when they came up to our car they were about 30 feet from our car; Rex and Glenn both got out from their car and they were both mad; I don't know what made them mad; when Rex came up to the car he jerked the front door open and took hold of the Layton boy; he started to pull him out of the car but it seems that the Layton boy braced him-

self and Rex could not pull him out; Rex made no attempt to strike the boy at that time but just tried to pull him out of the car; he did not tell the Layton boy at that time he was tired of his running around us and throwing dust in our faces; when Rex turned loose of the Layton boy he stepped back from the door of the car; I don't know what the Layton boy was doing, I was watching Rex, I wanted to see what he was going to do with this boy; all this time Glenn was standing by the side of Rex, he was not saying anything; as far as I know Rex didn't say anything as he turned the Layton boy loose; Rex jerked the back door open and reached in the car for the gun; I got possession of the gun up the road a little way, I wanted to know where it was as it was mine; I asked the two boys in the front seat where it was, I don't remember exactly what they said; they got it out of the compartment up in front; Ernest Freeman was sitting with me in the back seat; he is about 20 years of age and about the size of Glenn; I displayed this gun before the back door opened when Rex was at the front door; I showed it to him and told him to leave the Layton boy alone; I didn't tell him what I would do if he didn't leave the boy alone; I was sitting on the seat when I showed Rex the gun; I did not point it toward Rex or anyone else; it was pointed kinda southwest, a little bit east of the driver's head; I must have raised up a little, I pointed it to the southeast of Frank's head and told Rex to leave Frank Layton alone; Rex didn't say anything, he did not reach for the gun at that time; the front door of the car was open and Rex was standing in front of the door, the gun at that time was about 2 feet from Rex; Layton did not attempt to drive on; I did not want to stay and see the trouble through; no one told me to put the gun up, I had it kinda in front of me, I think I had my finger on the trigger; the gun was not pointing in Rex's direction, it was pointing toward the back seat (and illustrates position the gun was pointing) Rex was standing on the ground by the back door and leaning over the running board and opened the door and reached clear across and grabbed the gun; after Rex opened the door and grabbed the gun I just kept it there, I did not have time to take it away when I saw the door open; I didn't have time to do anything; I did

not push the gun around toward Rex when he grabbed it, somebody did, I suppose I did; my hand was on the trigger and there was a cartridge in the gun; when the gun fired it went into Rex's body and he was killed from the effects of the bullet; at the time the shot was fired I think the Black boy got out of the car; I got out of the car on the right hand side to see if I could do anything to help; I wanted to help if I could; I saw him fall; I went around the car to where he was but they had loaded him into Bill Wommack's car; after they left I got back in the Layton boys car and it was at that time I threw the gun away because I was disgusted, because I saw what I had done and I never wanted to see the gun again; I was shocked; I returned to town and was arrested and put in jail; I did not make the statement to Mr. Adee he testified to, I told him about where I thought the gun was—where I threw it; I did not tell Mr. Adee that was the only thing I saw to do to stop him; I did not make the statement to the ex-sheriff, I told him I thought I might bluff the boys; I believe I told Mr. Adee and the sheriff that he grabbed this gun and it went off accidentally; after the boy was struck was when I inquired where the gun was; I put the gun in the car pocket, I do not know why the party handed me the gun."

The foregoing is the substance of the defendant's testimony. The state offered some rebuttal testimony by calling Glenn Capansky, Betty Easley, Sylvia Walker Capansky, and C. R. Board, but the records show that the statements made by the witnesses on rebuttal were all immaterial and do not provide any definite proof.

At the close of all the testimony the defendant presented to the court his requested instruction No. 1, which is as follows:

"Gentlemen of the Jury:

"You are instructed that if you find and believe from the evidence or entertain a reasonable doubt from the same, that at the time the shot was fired which caused the death of the deceased that it was brought about and due to the fact that the deceased grabbed the pistol and that by so grabbing it caused the same to be discharged

and as a result thereof the deceased lost his life and you should further find or entertain a reasonable doubt that the defendant had no intention of discharging said pistol and that the discharge of same was accidental and the defendant merely exhibited the pistol with the sole intention of causing the deceased to desist in further assaulting Frank Layton and that the defendant was not engaged at the time of the commission of any crime or misdemeanor as defined heretofore in these instructions, then and in that event you should return a verdict of 'Not Guilty.'

"Refused and excepted to by the defendant."

Nine errors have been assigned by the defendant, as follows:

"1. The court erred in denying the request of the defendant, on the jury panel becoming exhausted, to have the necessary jurors selected and drawn from the list of jurors furnished by the jury commissioners and in ordering an open venire to be selected by special officer, which ruling of the court was duly excepted to at the time.

"2. That the trial court erred in permitting special counsel to take said cause out of the hands of the county attorney.

"3. That the court erred in permitting introduction of improper, incompetent, irrelevant, immaterial, hearsay and prejudicial evidence and testimony to the jury over the objection and exception of counsel for plaintiff in error.

"4. That the court erred in receiving the verdict of said jury which verdict is contrary to both the law and the evidence.

"5. That the trial court erred in overruling the motion of plaintiff in error for a new trial.

"6. That the trial court erred in giving his instruction to the jury as a whole which instructions do not correctly give and embody the law in said case.

"7. That the court erred in giving instructions No. 3, 4, 5, 6, 7 and 17, which instructions were duly excepted to by plaintiff in error at the time.

"8. That the court erred in refusing to give defendant's requested instruction No. 1, which refusal was duly excepted to at the time.

"9. That the punishment fixed by the jury in its verdict and by the court in its judgment and sentence is unreasonable and excessive in view of the evidence submitted at the trial of said cause."

Defendant's assignment, "that the court erred in overruling the plaintiff in error's motion for a new trial," in substance, covers all of the other assignments of error set forth in his petition in error, and they will all be considered together.

This case is a peculiar one, and unusual, viewed from any standpoint. The parties connected with this case prior to the night the deceased, Rex Gillispie, was killed were all neighbors and friends; the deceased and defendant had been special friends as boys while attending school in the same community for several years. That evening prior to the killing, Glenn Capansky, Sylvia Walker, now Sylvia Walker Capansky, Betty Easley and Rex Gillispie drove to Boise City in Rex Gillispie's car to attend a dance; the defendant, Frank Layton, Jr., Burton Black and Ernest Freeman, drove to Boise City in a car belonging to Frank Layton, Jr. The testimony conclusively shows they were there in the city together, and enjoyed the dance very much, and when it broke up they started home; the parties in Rex Gillispie's car started first, and Frank Layton, Jr., in his car followed. After they had driven some distance the Layton car passed the Gillispie car, and some one in the car asked them if they were going to the charivari, but they did not know what was said; they drove on further and Gillispie passed the Layton car, and they drove along that way for some time until the cars had passed each

other three times or more; finally some one in Gillispie's car holloed and the parties in the Layton car thought they called to them to stop. The road was dusty and the Layton car had good brakes on it, but the Gillispie car did not, and the Gillispie car bumped into the Layton car; they drove on a little further, and Glenn Capansky and Gillispie got out of their car and went up to the Layton car. The proof shows that Glenn Capansky was cursing and went up to the left side of the car and struck Frank Layton, Jr. At that time the defendant says Gillispie was standing out in the road laughing, and he supposed he was laughing at what Capansky was doing to Layton. The parties returned to their respective cars and drove on a short distance, and finally the Layton car stopped. Gillispie and Capansky went up to the Layton car; this time it is claimed by the parties in the Layton car that Gillispie went to the front door of the car, opened it and got hold of Layton and tried to pull him out of the car. Layton says he braced himself so Gillispie could not pull him out.

The defendant, John Tharp, Jr., had taken with them that evening, in the pocket of the car, a pistol and the proof shows when Gillispie tried to pull Layton out of his car, that some one handed the defendant the pistol, and the defendant told Gillispie to leave the boy alone, pointing the pistol up above the seat of the car; that Gillispie stepped back; Layton closed the front door of the car; some of the witnesses saying the deceased opened the back door of the car, but the defendant says he reached in and got hold of the pistol, and when he jerked it the pistol was discharged and took the life of Rex Gillispie, the deceased.

It is urged by the defendant that the court erred in refusing to give to the jury his requested instruction No. 1, and that the court failed in any of its instructions to clearly advise the jury as to his theory of the defense.

As shown by the record, the defense of the defendant was not that of justifiable homicide. The defendant at no time testified he took the life of the deceased to prevent personal injury to himself.

The defendant in support of his request for the special instruction complained of cites Harris v. State, 11 Okla. Cr. 412, 146 P. 1086; McIntosh v. State, 8 Okla. Cr. 469, 128 P. 735; Skelley v. State, 64 Okla. Cr. 112, 77 P. 2d 1162; Bradley v. State, 63 Okla. Cr. 203, 74 P. 2d 126, and many other cases.

The cases cited by the defendant are correct law if the facts are sufficient to authorize the court in giving the instruction requested. In this case the evidence as disclosed by the record did not warrant the court in giving the instruction.

The state insists that the court properly refused to give the requested instruction of the defendant, and that the refusal of the court did not deprive the defendant of a fair and impartial trial for the reason that the evidence is insufficient to warrant the court giving the requested instruction, and insists that the instructions of the court when considered as a whole sufficiently cover the facts and that the defendant was not deprived of any of his rights by reason of the court failing to give the requested instructions to the jury on the law as applied to the facts, citing Nutt v. State, 8 Okla. Cr. 266, 128 P. 165; Cole v. State, 18 Okla. Cr. 430, 195 P. 901; Moore v. State, 25 Okla. Cr. 118, 218 P. 1102; Ned v. State, 29 Okla. Cr. 389, 233 P. 1096.

No defense was offered by the defendant except his statement in which he claimed the killing was an accident. It is true that the parties had been passing each other upon the highway, and that the deceased, Rex Gillispie, got out of his car and went up to the car in which the defendant was riding and told the boys in the

car that if they thought they were smart, to get out of the car and he would show them.

The witness Layton claims that at the time the shot was fired, the deceased, Rex Gillispie, was within a foot or a foot and a half of the car in which the defendant was riding.

It is always the duty of the court to instruct the jury on questions of law developed by the evidence, but the court is not required to instruct on any question not brought out by the evidence which tends to show a theory warranting the court to give such an instruction. The court is not required to invade unexplored fields and instruct on a question not borne out by the testimony.

The evidence, as well as the surrounding circumstances, clearly shows that when the defendant got the pistol out of the compartment of the car while the deceased was near the car trying to pull the Layton boy out of the car or had the car door opened, that he pointed the pistol in the direction of defendant, if not directly at him, and that shortly thereafter the pistol was discharged, striking the deceased in a vital part of the body, from which wound he died. There is no evidence showing or tending to show, except the statement of the defendant, that the deceased got near enough to him to catch hold of the pistol and that in doing so the pistol was discharged. All of the state's witnesses contradict the defendant.

There is no evidence justifying the defendant's action in shooting the deceased. The shooting of the deceased by the defendant was done in a fit of anger against his school-boy and lifelong friend, not fully realizing the consequences of his act. Whether or not the pistol was pointed at deceased is not clearly shown by the evidence and is entirely immaterial so far as this opinion goes, for the reason that all of the testimony

shows that he shot the deceased after he had pointed the pistol in the direction where the deceased was standing.

The defendant at the time the shot was fired was committing a misdemeanor by pointing the pistol at the deceased. He was also committing a misdemeanor when he carried a loaded pistol with him that night.

All of the testimony upon the question as to whether there were powder burns on the deceased's hand and on the jacket of the deceased shows there were none on the hand or jacket.

The only question urged by the defendant is the refusal of the court to give the requested instruction complained of.

After carefully reviewing the evidence and studying the same, we hold that the court did not err in refusing to give the special instruction requested by the defendant. The instructions of the court when considered as a whole correctly advised the jury as to the law applicable to the facts. The defendant was accorded a fair and impartial trial.

There are several other errors alleged by the defendant, but after a careful examination of the same, we hold they are without merit.

The evidence in this case is sufficient to sustain a conviction, but in view of the facts as disclosed by the record, that the deceased and the defendant had spent their boyhood days together, had been lifelong friends and associates, and in view of the further fact that up until the time of the shooting, so far as is disclosed by the record, they had never had any trouble, considering all of these facts and circumstances, we believe that the punishment inflicted in this case is excessive and

432

should be modified from 25 years in the state penitentiary to 12 years, and as modified the judgment is affirmed.

DOYLE, P. J., and BAREFOOT, J., concur.